UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DEBORAH PIDGEON NELSON                                   CIVIL ACTION

VERSUS                                                   NO. 13-6118

SOCIAL SECURITY ADMINISTRATION                           SECTION: "B"(3)

ORDER AND REASONS

I. Nature of Motion and Relief Sought

Before the Court is Plaintiff's Objection to the Magistrate Judge's Report and Recommendation.[1] Plaintiff, Deborah Nelson ("Nelson"), seeks review of the Magistrate Judge's decision upholding the denial of her claim for disability insurance benefits ("DIB") pursuant to Title 42 U.S.C. § 405(g).[2]

Having considered Nelson's objections, the cross motions for summary judgment filed by both Nelson and Defendant Social Security Administration (the "Commissioner"), the Magistrate Judge's Report and Recommendation, the record, and the applicable law, for the following reasons, the Court **GRANTS** the Commissioner's motion for summary judgment and **DENIES** Nelson's motion for summary judgment.[3]

---

[1] Rec. Doc. No. 16.
[2] Rec. Doc. No. 15.
[3] We are grateful for the work on this case by Lauren Michel, a Tulane Law School extern with our Chambers.

**Procedural History**

Deborah Pidgeon Nelson, Plaintiff herein, filed the subject application for DIB with the Social Security Administration on September 28, 2011, alleging disability as of March 31, 2010.[4] In a "Disability Report-Adult" form that appears in the administrative record below, the conditions resulting in Plaintiff's inability to work were identified as lupus and chiari malformation.[5] On October 12, 2011, Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process.[6]

Pursuant to Plaintiff's request, a hearing *de novo* before an Administrative Law Judge ("ALJ") went forward on May 29, 2012, at which Plaintiff, who was represented by counsel, appeared and testified.[7]  On June 26, 2012, the ALJ issued a written decision, concluding that Plaintiff was not disabled within the meaning of the Social Security Act.[8]

The Appeals Council ("AC") subsequently denied Plaintiff's request for review of the ALJ's decision on September 6, 2013, thus making the ALJ's decision the final decision of the Commissioner.[9]  It is from that unfavorable decision that the

---

[4] Rec. Doc. No. 15, pp. 1.
[5] Rec. Doc. No. 15, pp. 1.
[6] Rec. Doc. No. 15, pp. 1.
[7] Rec. Doc. No. 15, pp. 1.
[8] Rec. Doc. No. 15, pp. 1.
[9] Rec. Doc. No. 15, pp. 2 , Tr. pp. 1-6.

Plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In her cross-motion for summary judgment, Plaintiff frames the issues for judicial review as follows:

I.    THE ALJ FAILED TO APPLY THE CORRECT LEGAL STANDARD IN FINDING THAT PLAINTIFF'S CHIARI MALFORMATION WAS NOT A SEVERE IMPAIRMENT.

II.   THE ALJ DID NOT APPLY THE CORRECT LEGAL STANDARD IN ASSESSING PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY AND THE FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

III.  THE ALJ FAILED TO APPLY THE PROPER LEGAL STANDARD TO DETERMINE THE CREDIBILITY OF THE PLAINTIFF.[10]


Relevant to a resolution of those issues are the following findings made by the ALJ:

1.  [t]he claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.  [t]he claimant has not engaged in substantial gainful activity since March 31, 2010, the alleged onset dated (20 CFR 404.1571 *et seq.*).

3.  [t]he claimant has the following severe impairments: degenerative disc disease and systemic lupus erythematosus (SLE) (20 CFR 404.1520(c)).

4.  [t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1520(d), 404.1525 and 404.1526).

---

[10] Rec. Doc. No. 15, pp. 2, Rec. doc. 11-1, p. 5.

5. [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work, generally defined in 20 CFR 404.1567(b) as work requiring lifting/carrying no more than 10 pounds frequently and 20 pounds occasionally, and no more than 6 hours of standing/walking in an 8 hour workday.

6. [t]he claimant is capable of performing past relevant work as an administrative clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. [t]he claimant has not been under a disability, as defined in the Social Security Act, from March 31, 2010, through the date of this decision (20 CFR 404.1520(f)).[11]

**Facts of the Case**

The medical evidence that was generated during the relevant time period begins with a treatment note from the Ochsner Clinic in Kenner where Plaintiff was seen to obtain refills on her medication and to establish a relationship with a new primary care physician ("PCP"). Plaintiff presented as a fifty-two year old individual with a history of hypertension, hyperlipidemia, and lupus. No acute symptoms were present and the results of a physical examination were normal. The assessment was hypertension and hyperlipidemia. Further testing was scheduled and Plaintiff was given prescriptions for Atenolol, Lotrel, and Lovastatin.[12]

---

[11] Rec. Doc. No. 15, pp. 3.
[12] Rec. Doc. No. 15, pp. 5, Tr. pp. 215-217.

Plaintiff was seen at the Ochsner Clinic again on June 9, 2009 for complaints of back pain that had begun when she bent over to change her shoes. That pain was described as sharp and intermittent, worse with certain movements, and at a level of "4" on a scale of "1" to "10." There was no radiation associated with the pain and no weakness or numbness of the lower extremities. Otherwise, all other bodily systems were normal with no acute complaints. Upon physical examination, there was tenderness to percussion of the paraspinous muscles of the lower back as well as muscle spasms. However, motor strength was 5/5 in the lower extremities with good sensation and straight leg raising was negative. The assessment was low back pain. Plaintiff was administered an injection of Kenalog and was given prescriptions for Flexeril, Relafen, and Ultram.[13]

Plaintiff was next seen at the Ochsner Clinic on October 2, 2009 for a routine physical. Her back pain had resolved and she had no acute complaints. Plaintiff was working for Shell at the time. The results of the examination were unremarkable and Plaintiff was merely given refills of her medications.[14] Mammographic studies performed on December 15, 2009 revealed no evidence of malignancy.[15]  On January 2, 2010,

---

[13] Rec. Doc. No. 15, pp. 6, Tr. pp. 213-214.
[14] Rec. Doc. No. 15, pp. 6, Tr. pp. 210-212.
[15] Rec. Doc. No. 15, pp. 6, Tr. p. 220.

Plaintiff was seen by Dr. Susan Caldwell for complaints of a headache and vomiting. The results of a physical examination were normal. The diagnosis was nausea and vomiting likely secondary to a viral infection and Plaintiff was treated with Phenergan.[16]

The next treatment note was not generated until September 11, 2010, when Plaintiff was seen at the Ochsner Clinic for headaches of a few hours in duration associated with upper back pain, nausea, and an episode of vomiting. The headaches were mainly frontal with no radiation, photophobia, or blurring of vision.  The results of a physical exam were essentially normal but there was minimal stiffness to the neck due to upper back muscle spasm. The diagnosis was headaches, muscle spasm, and hypertension as a result of an inability to self-medicate due to nausea. Bloodwork was done and Plaintiff was prescribed Toradol, Naproxen, Phenergan, and Flexeril.[17]

Plaintiff was next seen at the Ochsner Clinic on October 5, 2010 for a routine physical. No acute complaints were voiced, including any pertaining to headaches. The results of the exam were wholly unremarkable. Routine testing was performed. (Rec. Doc. No. 15, Tr. pp. 205-207, 362-365). On October 28, 2010, Plaintiff was seen by Dr. Taura Parquet of the Ochsner Clinic for complaints of constant left leg pain

---

[16] Rec. Doc. No. 15, pp. 6, Tr. pp. 208-209.
[17] Rec. Doc. No. 15, pp. 7, Tr. pp. 347-348, 366.

for the previous week, described as a cramping sensation at a level of "5." Trauma, weakness, and numbness were denied. Upon physical examination, there was tenderness to palpation of the left leg with mild muscle spasm but motor strength was 5/5 in the lower extremities.  The assessment was leg pain. Plaintiff was prescribed Norflex and Ultracet and was instructed to apply warm compresses to the leg and to stretch.[18]

On November 14, 2010, Plaintiff presented to the Ochsner Emergency Room ("ER") with complaints of nausea and vomiting several times that day as well as a mild headache. Various tests were run and Plaintiff was treated with IV administration of Toradol and Zofran. She was ultimately discharged home in good condition with a prescription for Ondansetron and a diagnosis of nausea and vomiting.[19] Plaintiff was followed by Dr. Parquet the next day at the Ochsner Clinic and was said to be improving. She was diagnosed with acute nausea, vomiting, and dehydration and was treated with Phenergan. NSAID's were to be discontinued and Zofran and Protonix were prescribed.[20]  Plaintiff was next seen at the Ochsner ER on November 21, 2010 for complaints of a headache of one week's duration and multiple episodes of vomiting. She was administered IV saline, Dilaudid, and Phenergan and was ultimately discharged home in good condition with

---

[18] Rec. Doc. No. 15, pp. 7, Tr. pp. 203-204.
[19] Rec. Doc. No. 15, pp. 7, Tr. pp. 223-262.
[20] Rec. Doc. No. 15, pp. 7, Tr. pp. 201-202.

prescriptions for Hydrocodone-Acetaminophen and Ondansetron. The diagnosis was a headache, nausea, and vomiting.[21] Plaintiff was followed by Dr. Parquet the following day, explaining that her headache was different from those that she had experienced in the past. In the "history of present illness" portion of the treatment note, headaches were denied as were nausea, vomiting, or any other acute complaints. Unfortunately, the second page of the treatment note from this date is not included in the administrative record that has been provided to the Court.[22]

On December 10, 2010, Plaintiff underwent a CT scan of the head without contrast that produced no evidence of acute intracranial abnormality but did reveal findings suspicious of underlying cerebellar tonsillar ectopia versus chiari one malformation. As in the admitting paperwork from her previous ER visits, Plaintiff was now described as "retired."[23] Plaintiff underwent mammogram and bone density studies on December 17, 2010.[24] An eye exam was conducted on January 10, 2011.[25]

On July 5, 2010, Plaintiff returned to the Ochsner Clinic to establish a treatment relationship with a new PCP, Dr. Susan Caldwell. Plaintiff reported that she had

---

[21] Rec. Doc. No. 15, pp. 8, Tr. pp. 263-272.
[22] Rec. Doc. No. 15, pp. 8, Tr. p. 200.
[23] Rec. Doc. No. 15, pp. 8, Tr. pp. 273-274, 219.
[24] Rec. Doc. No. 15, pp. 8, Tr. pp. 373-375, 218.
[25] Rec. Doc. No. 15, pp. 8, Tr. p. 346.

experienced no headaches since her ER visits at the end of 2010. She also recalled having been diagnosed with lupus in the 1980's accompanied by a rash and proteinuria but no further symptoms since then. The sole complaint voiced by Plaintiff was a sore throat of four days' duration with severe nasal congestion. A physical examination was unremarkable. The diagnosis was unspecified hyperlipidemia; essential hypertension, unspecified; allergic rhinitis; and, an abnormal CT scan of the head suggestive of chiari malformation. Various tests were run and an MRI of the brain was to be scheduled.[26]

Pursuant to a referral from Dr. Caldwell, Plaintiff was seen by Dr. Cuong Bui at Ochsner on August 16, 2011 for further evaluation of her possible chiari malformation. Although she had suffered no headaches since the previous year, she did have increased feelings of tingling and numbness in the arms and shoulders that was occasionally exacerbated by Valsalva maneuvers. Upon physical examination, Plaintiff had some mild dysmetria, a slight amount of trace, and some difficulty with tandem gait but reflexes were equal and symmetric, strength was 5/5 in all extremities, and there was no tenderness to palpation. Based on the results of his evaluation and the other objective data available for review,

---

[26] Rec. Doc. No. 15, pp. 9, Tr. pp. 197-199, 359-361, 426-428.

Dr. Bui believed that further evaluation of Plaintiff's condition was warranted. To that end, an MRI of the cervical spine without contrast was to be ordered.[27]

On August 30, 2011, Plaintiff presented to the Ochsner ER again complaining of a frontal headache since the previous evening that was constant and caused aching, moderate pain associated with upper mid back pain. Plaintiff also had associated photophobia and nausea with four episodes of vomiting. After injections of Toradol, Benadryl, and Compazine failed to alleviate Plaintiff's symptoms she was placed on IV administration of normal saline, morphine, and Zofran which provided significant relief. The attending physician suspected that the nausea and vomiting were associated with an acute viral illness and not the headache. The diagnosis was nausea and vomiting and a headache. Discharge prescriptions were Butalbital-Acetaminophen-caffeine and Zofran ODT and Plaintiff was to follow-up with her PCP.[28]

As ordered, Plaintiff underwent an MRI of the cervical spine without contrast on September 27, 2011 which revealed ectopia of the cerebellar tonsils extending below the foramen magnum but no cerebellar tonsilar "breaking" as typically seen in chiari one malformations and no syrinx identified. Dr. Bui, in turn, interpreted those test results as more

---

[27] Rec. Doc. No. 15, pp. 9, Tr. pp. 344-345, 413-415.
[28] Rec. Doc. No. 15, pp. 10, Tr. pp. 275-282.

suggestive of migraine headaches than actual chiari-type symptoms and Plaintiff was to be referred to Dr. Redillas, a headache specialist in the Neurology Department, for a more definitive diagnosis.[29]

On October 3, 2011, Plaintiff completed the Administration's "Function Report- Adult" form that is designed to elicit information about how her conditions limited her activities. There, Plaintiff wrote that because of her lupus, fatigue and joint pain were more frequent. She reportedly could not sit for extended periods of time as she would become lightheaded and would need to rest. Flare-ups with her back kept her "down" for three to four days after taking anti-inflammatories and muscle relaxers and she had recently begun experiencing headaches.

A typical daily routine consisted of taking her medications, getting her grandson on the bus on school days, preparing meals, watching TV, running errands and, on two days per week, checking up on her son and mother-in-law. Back flare-ups caused trouble in dressing and getting in and out of the bathtub and those and leg pain affected her sleep. Plaintiff prepared meals two days per week and did cleaning, laundry, and ironing as needed but her husband assisted her with the chores. She got out of the house daily on her own and could

---

[29] Rec. Doc. No. 15, pp. 10, Tr. pp. 371-372, 433-434, 343.

drive a car. She went shopping about once per month. Her interests included watching TV and doing crossword puzzles, provided that she did not sit for too long and could move around. Social activities included Sunday dinners, meeting with family and friends, and going to church and the hair salon. Plaintiff indicated that her conditions affected her ability to lift, squat, bend, reach, sit, kneel, and concentrate. She could follow instructions and handle stress without difficulty and got along well with authority figures.[30]

Pursuant to the referral by Dr. Bui, on October 21, 2011, Plaintiff was seen by Dr. Carol Redillas of the Ochsner Clinic for further evaluation of her headaches which had been ongoing for the previous year and had been stable in frequency, intensity, and duration. At that time, Plaintiff was experiencing headaches at a rate of one to two per month, each lasting a few hours with successful abortive therapy and rest in a dark room. The headaches were gradual in onset with non-radiating mild to severe midfrontal throbbing sensations associated with bilateral shoulder tightness, nausea, vomiting, and photophobia. Specific triggers were unknown as the headaches were usually present upon awakening. Plaintiff reported that Hydrocodone, Fioricet, and Tylenol were effective for pain management. She also recalled her three ER visits in

---

[30] Rec. Doc. No. 15, pp. 11, Tr. pp. 151-158.

the previous year for acute treatment. Plaintiff scored 46 on a Headache Impact Test ("HIT-6"), which equates to little or no impact on her life at that time. Based upon the results of her physical examination of Plaintiff and a review of the objective test results, Dr. Redillas' impressions were episodic migraine without aura, poorly controlled hypertension, and asymptomatic cerebellar ectopia. The preventative therapy plan involved increasing the dosage of Atenolol and the abortive therapy plan consisted of Vicodin, Phenergan, and Ketoprofen. Plaintiff was also counseled on other headache-avoidance measures.[31]

Bloodwork was performed on November 15, 2011.[32] On November 21, 2011, Plaintiff was seen by Dr. Tamika Webb-Detiege of the Ochsner Clinic with the chief complaint being identified as lupus. Plaintiff reported a diagnosis in the early 1990's and relatively limited treatment thereafter. Symptoms included photosensitivity and a rash on her arms with sun exposure but no other traditional symptoms. During this visit, Plaintiff relayed to the doctor an interest in obtaining Social Security benefits, advising she had already retired from an "administrative job."

Persistent headaches and back pain that improved with Naprosyn were also noted as was some tingling in the left

---

[31] Rec. Doc. No. 15, pp. 12, Tr. pp. 329-342, 403-411.
[32] Rec. Doc. No. 15, pp. 12, Tr. pp. 356-358, 423-425.

fifth toe. However, at the time of the evaluation Plaintiff rated her pain as a "0." A physical examination was essentially normal. The impressions were lupus with various manifestations but no treatment for several years, fatigue, back pain, and migraines. Various studies were done, including x-rays that revealed degenerative changes of the lumbar spine and the possible presence of a gallstone versus right nephrolithiasis but no significant cardiopulmonary abnormalities.[33] Mammography was done on December 19, 2011 which demonstrated no evidence of malignancy.[34] An eye exam was conducted on January 5, 2012 which revealed no changes from the previous visit.[35]

On January 20, 2012, Plaintiff attended a three-month follow-up appointment with Dr. Radillas. She reported no side effects from Atenolol. According to the diary that she kept roughly 75% of the time, Plaintiff had experienced one headache in October, three in November, one in December, and three so far in January, all of which were mild except one, which was moderate in intensity. Once again, Plaintiff scored 46 on the Headache Impact Test. The impressions were episodic migraine without aura and improved hypertension. Plaintiff was counseled and was continued on Atenolol for preventative

---

[33] Rec. Doc. No. 15, pp. 12, Tr. pp. 326-328, 351-355, 368-370, 400-402, 418-422, 430-432.
[34] Rec. Doc. No. 15, pp. 12, Tr. pp. 367, 429.
[35] Rec. Doc. No. 15, pp. 12, Tr. pp. 325, 399.

therapy and Phenergan, Ketoprofen, and Imitrex for abortive therapy. A further follow-up visit was to occur in eight months.[36]

On February 6, 2012, Plaintiff returned to Dr. Webb-Detiege for further consultation regarding her lupus. Her condition was unchanged from the previous visit. Diagnostic testing was performed and the results of those tests and earlier ones were reviewed. The impressions were a history of lupus with various manifestations but no evidence of activity at the time, fatigue, back pain, migraines, elevated ESR and CRP, and dizziness. Further testing was to be scheduled and Plaintiff was to return in two months.[37]

Plaintiff underwent an abdominal ultrasound on March 16, 2012 which revealed a mobile gallstone within the gallbladder but no secondary signs suggestive of acute cholecystitis, borderline hepatomegaly without definite focal hepatic lesion, and a 2.8 cm. anechoic focus right renal pelvis suggestive of a parapelvic cyst but without calyceal dilation.[38] Plaintiff presented to the Ochsner ER on March 24, 2012 complaining of left leg pain for one month which had worsened the previous day. The pain was described as crampy, deep, and moderate in severity. Physical therapy had begun the previous day.

---

[36] Rec. Doc. No. 15, pp. 13, Tr. pp. 321-324, 395-398.
[37] Rec. Doc. No. 15, pp. 13, Tr. pp. 314-320, 350, 388-394, 417.
[38] Rec. Doc. No. 15, pp. 13, Tr. pp. 288-290.

Upon physical examination, there was tenderness to the left upper leg but no other positive findings. The diagnosis was a hip and thigh strain. An injection of Solu- Medrol was administered and Plaintiff was prescribed Oxycodone.[39] On a referral from Dr. Caldwell, Plaintiff was seen by Dr. Hazem Eissa on March 28, 2012 with the chief complaint being identified as low back pain of five weeks' duration which radiated down the left posterior leg into the foot with associated parathesias. Naproxen helped minimally. The pain was described as throbbing, grabbing, tight, and tingling in the posterior and lateral left leg with numbness. It was worse with sitting, standing, lying, walking, and in the morning but was improved with rest, sitting, and lying down. It was noted that Plaintiff's symptoms were exacerbated following commencement of physical therapy. Upon physical examination, straight leg raising was positive on the left but muscle strength in the lower extremities was within functional limits, 5/5 bilaterally. The assessment was lumbar radiculopathy. The treatment plan included: 1) an MRI of the lumbar spine without contrast; 2) a left L5-S1 transforaminal epidural steroid injection ("ESI") or appropriate procedure after review of the MRI results; 3) one to two tablets of Tramadol three times per day or as needed; and, 4) return to

---

[39] Rec. Doc. No. 15, pp. 13, Tr. pp. 291-300.

the clinic two weeks after the MRI.[40]

On March 30, 2012, Plaintiff was seen by Dr. Tiffany Croll of the Ochsner Clinic for six-month follow-up of her chiari malformation. No complaints were raised at the time and Plaintiff reported that since January, she had not experienced any headaches (which had been very mild in nature prior to that). The impression was asymptomatic chiari malformation warranting no neurosurgical intervention. Plaintiff was to return to the clinic on an as-needed basis.[41] She was next seen by Dr. Evangeline Scopelitis of the Ochsner Clinic on April 9, 2012 with the chief complaint being identified as lupus. Plaintiff again expressed an interest in obtaining Social Security benefits due to persistent low back pain that was worse with sitting and improved with NSAID's. A musculoskeletal exam produced unremarkable results. The results of diagnostic tests were reviewed. The impressions were: 1) a history of lupus with various past manifestations but without treatment for several years and no evidence of activity; 2) fatigue due to back pain; 3) back pain; 4) migraines; 5) elevated ESR and CRP; and, 6) dizziness, resolved. Given the absence of active symptoms, no treatment was recommended for Plaintiff's lupus, her low back pain was being addressed with pain management, and she was to return in

---

[40] Rec. Doc. No. 15, pp. 14, Tr. pp. 309-313, 383-387.
[41] Rec. Doc. No. 15, pp. 14, Tr. pp. 306-308, 381-382.

four to six months or as needed.[42] The final medical records that were admitted in the administrative proceedings below document a routine abscess culture of Plaintiff's forearm on May 7, 2012 that was negative.[43]

As noted earlier, a hearing before an ALJ went forward on May 29, 2012 with Plaintiff and her attorney in attendance. After the documentary exhibits were admitted into evidence Plaintiff took the stand and was questioned by the ALJ. She was 55 years old at the time, had a high school diploma and had attended eighteen months of business school, and had last worked up until March 31, 2010 when she was let go as a result of a reduction-in-workforce. Following that break in employment, Plaintiff received severance pay until sometime in 2011. When asked why she was unable to work, Plaintiff identified pain in the legs and arms, an inability to sit or stand for extended periods of time or to walk great distances, and dizziness and light headedness on sitting too long or driving. Plaintiff attributed her joint pain to lupus and her leg pain to problems with her back.[44]

Upon being tendered to her attorney for further questioning Plaintiff testified that she had worked at the Shell Norco plant for thirty-two years in various capacities,

---

[42] Rec. Doc. No. 15, pp. 15, Tr. pp. 302-305, 377-380.
[43] Rec. Doc. No. 15, pp. 15, Tr. pp. 349, 416.
[44] Rec. Doc. No. 15, pp. 15, Tr. pp. 30-34.

most recently as an administrative associate, all of which were done from a sitting position. When referred to diagnostic studies that had recently been performed, Plaintiff testified that an MRI had revealed a cyst on her kidney, for which a doctor's appointment had been scheduled in July. Plaintiff was then directed to her back issues which caused pain in the lower back that radiated down her leg and made her feet numb. She testified that she had received ESI's for her back pain which were not particularly helpful. Plaintiff also experienced fatigue, likely attributable to lupus, the chiari malformation, and migraine headaches that were present upon awakening, caused pain across the shoulder blade, and incapacitated her for most of the day, sometimes requiring ER treatment. Those headaches occurred once per month and lasted all day. Plaintiff was on an assortment of prescription medications and she was observed to use a cane for ". . . walking the distances" that she had taken up on her own but was to discuss with her doctor at her next follow-up visit. She had also participated in physical therapy in the past.[45]

When asked to describe a typical day, Plaintiff explained that until just a few months earlier she was capable of seeing her grandson off to school in the mornings and assisting with the care of her elderly parents and her disabled son on a

_____

[45] Rec. Doc. No. 15, pp. 16, Tr. pp. 34-38.

weekly basis. She was also capable of doing some of the cleaning, cooking, and shopping. However, Plaintiff was no longer able to engage in such activities due to limitations in standing and walking. She also became dizzy and lightheaded when sitting and then driving for long distances. Although Plaintiff once went to the gym five days per week, walked two miles, and rode the stationary bike at home, she was now limited to walking only twenty to thirty feet before having to sit and take a break. Shopping was done by her husband. Plaintiff estimated that she could only stand five to ten minutes before experiencing leg pain and numbness in her feet. She avoided climbing stairs and limited her lifting to two to five pounds due to difficulties with her shoulders, the left worse than the right. Plaintiff testified that she could sit for only 15 minutes before getting dizzy, lightheaded, and having tingly fingers, requiring her to lie down until it subsided. On a typical day, Plaintiff would reportedly lie down two to three hours. In response to counsel's question, Plaintiff indicated that she could not engage in the clerical work she had once performed because of the commute involved, leg pain from walking and standing, and lightheadedness and dizziness from sitting.[46]

After counsel's questioning of Plaintiff was completed,

---

[46] Rec. Doc. No. 15, pp. 17, Tr. pp. 38-42.

the ALJ queried counsel about the frequency of Plaintiff's visits to the ER for headache-related treatment which had occurred on successive weekends during the latter part of 2011. At counsel's suggestion, the ALJ agreed to keep the record open for submission of updated medical records, including the results of a recent MRI.[47]

## Plaintiff's Contentions

Plaintiff raises three objections to the Magistrate's findings. First, Plaintiff argues that the ALJ failed to apply the correct legal standard in concluding that her chiari malformation was not a severe impairment.[48]

Second, Plaintiff argues that the ALJ did not apply the correct legal standard in assessing her residual functional capacity ("RFC") and that his findings on the issue were not supported by substantial evidence.[49] Plaintiff alleges that the RFC assessment that was found by the ALJ failed to include limitations from all of her severe impairments, which included lupus, chiari malformation, degenerative disc disease, and chronic migraines. Third, Plaintiff argues that the ALJ failed to apply the proper standard to determine her credibility.[50]

---

[47] Rec. Doc. No. 15, pp. 17, Tr. pp 42-44.
[48] Rec. Doc. No. 15, pp. 17.
[49] Rec. Doc. No. 15, pp. 21.
[50] Rec. Doc. No. 15, pp. 24.

**Law and Analysis**

Standard of Review

This Court's review is limited to determining whether 1) substantial evidence exists in the record, as a whole, to support the findings of the Commissioner; and 2) whether the Commissioner applied the proper legal standards in evaluating the evidence. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) (citation omitted). Substantial evidence is more than a scintilla but less than a preponderance, and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citation omitted).

Findings by the Commissioner which are supported by substantial evidence are conclusive and must be affirmed. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389 (1971). Such findings are conclusive and must be affirmed despite alternative conclusions which the court might also find to be substantially supported by the evidence. *Arkansas v. Oklahoma*, 503 U.S. 91, 112-113 (1992). "The court does not reweigh the evidence in the record, try the issues *de novo*, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton*, 209 F.3d at 452. The

obligation to resolve conflicts in the evidence is one for the Commissioner, not for the courts. *Id*.

To be considered disabled and thus eligible for DIB, a plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); *Newton* at 452. The Commissioner uses a five step sequential process in determining whether a claimant is disabled within the meaning of the Act.[1] *Newton*, 209 F.3d at 453 (citing 20 C.F.R. §404.1520). The claimant has the burden of proof under the first four steps of the inquiry. *Newton*, 209 F.3d at 453. If Plaintiff successfully carries this burden, the burden shifts to the Commissioner under the fifth step to show that the claimant is capable of performing alternative work that

---

[1]The five-step evaluation process requires consideration of the following:

1) Whether the claimant is not working in substantial gainful activity;

2) Whether the claimant has a severe impairment;

3) Whether the claimant's impairment meets or equals a listed impairment in Appendix 1 of the Regulations;

4) Whether the impairment prevents the claimant from doing past relevant work; and

5) Whether the impairment prevents the claimant from doing any other work.

*Newton*, 209 F.3d at 453 (citing 20 C.F.R. §404.1520).

exists in the national economy. *Id*.   Thereafter, the burden is on the Plaintiff to rebut her capability to perform alternative work. *Id.*

The Court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history." *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995).

**Analysis**

**A. Plaintiff argues that the ALJ failed to apply the correct legal standard in concluding finding that her chiari malformation was not a severe impairment.**

As noted in the Magistrate's Report and Recommendation, the standard that the Plaintiff recites is: "[a]n impairment is severe if it significantly limits an individual's ability to perform work related functions. *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985); 20 C.F.R. 404 § 1521."[51] The Magistrate relied upon and applied this precise legal standard. The ALJ recited similarly that "[a] medically determinable impairment…is 'severe'...if it significantly limits an individual's...ability to do basic work activities (20 CFR 404.1521)."[52]   The ALJ

---

[51] Rec. Doc. No. 15, pp. 18.
[52] *Id.*

decision also cites *Stone* in several places, thus relying on the same legal standard as Plaintiff.[53]

With respect to the chiari malformation, the record does not support a finding that this caused Plaintiff to be "significantly limited" in her "ability to do basic work activities." *See Stone*, 752 F.2d at 1099. Plaintiff was assessed by various physicians and almost none of the symptoms point to chiari malformation, and even if it did, the symptoms do not support a finding that the condition impacts Plaintiff's daily life. Following the initial suggestion by a CT scan that Plaintiff might have the condition of chiari malformation as opposed to another condition, Plaintiff was sent for further evaluation by Dr. Caldwell and Dr. Bui.[54]

Neither doctor diagnosed Plaintiff with chiari malformation, and Dr. Bui found that her MRI was suggestive of migraine headaches.[55] Next, Dr. Redillas was consulted by Plaintiff for headaches and migraines. *Id.* The doctor diagnosed Plaintiff with episodic migraines, not chiari malformation.[56] Plaintiff next was seen by Dr. Webb-Detiege who found that she was in no pain, her headaches and backaches were improving with

---

[53] *Id.*
[54] *Id.*
[55] Rec. Doc. No. 15, pp. 19.
[56] *Id.*

medication, and her physical examination was normal, no discussion of chiari malformation.[57]

Plaintiff was again seen by Dr. Redillas and again was diagnosed with episodic migraines, not chiari malformation. *Id.* Following Dr. Redillas' visit, Plaintiff again was seen by Dr. Webb-Detiege and was diagnosed with migraine headaches, and yet again not chiari malformation.[58] The final discussion of chiari malformation appears during a follow-up visit to Dr. Croll at which time Plaintiff was essentially discharged from Dr. Croll's care for lack of symptoms pertaining to chiari malformation.[59]

Based on the above medical evidence, it is questionable whether Plaintiff suffered from chiari malformation at any time. However, even if Plaintiff was suffering from the symptoms of chiari malformation, the symptoms that she experienced were not a severe impairment that significantly limited her ability to do work activities, such as her previous administrative position. Consequently, the ALJ and the Magistrate Judge applied the correct legal standard in assessing Plaintiff's abilities.

**B. Plaintiff argues that the ALJ did not apply the correct legal standard in assessing her residual functional capacity ("RFC") and that his findings on the issue were not supported by substantial evidence.**

---

[57] *Id.*
[58] *Id.*
[59] Rec. Doc. No. 15, pp. 20.

Plaintiff argues that "had the totality of all of her limitations been considered...the ALJ's assessment would have been different and...'would have significantly altered the opinions of the Vocational Expert and resulted in a finding of disabled.'"[60] She argues that the specific medical diagnoses: lupus, chiari malformation, degenerative disc disease, and chromic migraines were left out of the RFC assessment that was arrived at by the ALJ.[61]

First, Plaintiff failed to identify degenerative disc disease and chronic migraines as disabling conditions in her application for DIB and related paperwork.[62] *Cf. Pierre v. Sullivan*, 884 F.2d 789, 802 (finding that the only declared mental impairment was "nerves" and that does not require the ALJ to order further tests to find for a possible disability). Lupus and chiari malformation were listed as the two conditions that were afflicting Plaintiff at the time that the paperwork was filed.[63]

The record does not reflect severe complaints of lupus to any physician.[64] Her ability to work until 2010 was unaffected by her lupus diagnosis.[65] *Fraga v. Bowen*, 810 F.2d 1296, 1305)(ability to work after with a pre-existing condition

---

[60] Rec. Doc. No. 15, pp. 21.
[61] *Id.*
[62] *Id.*
[63] Rec. Doc. No. 15, pp. 22.
[64] *Id.*
[65] *Id.*

supports a finding of no disability). The record reflects that it was not lupus or any other disability that forced Plaintiff to cease working, but a reduction-in-workforce.[66] Based on these facts, it would have been improper for the ALJ to refer to lupus in the RFC assessment. Further, based on the analysis above pertaining to chiari malformation, it also would not have been properly included in the RFC assessment. Based on this analysis of the record, there is no basis for disturbing the Commissioner's decision and the correct legal standard was applied.

### C. Plaintiff argues that the ALJ failed to apply the proper standard to determine her credibility.

Plaintiff again asserts that the ALJ relied on "erroneous propositions" in stating that her headaches were mild and were no longer associated with vomiting, nausea, and shoulder pain.[67] She states that this was untrue and that more severe symptoms were reported in March 2012.[68] The Fifth Circuit in *Sharlow v. Schweiker* made it clear that the ALJ must "consider a claimant's subjective complaints of pain and other limitations."[69] 665 F.2d 645, 648 (5th Cir. 1981).

---

[66] *Id.*
[67] Rec. Doc. No. 15, pp. 24.
[68] *Id.*
[69] *Id.*

However, the ALJ may determine the "debilitating nature" of the symptoms within their own discretion, and the burden is on Plaintiff to provide objective medial evidence of conditions in order for relief to be granted. *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987); *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). The ALJ must then weigh the claims of the "debilitating nature" of the symptoms against the objective medical evidence provided by Plaintiff, including making credibility determinations pertaining to the claimant, the doctors, and witnesses. *Chapparo v. Brown*, 815 F.2d 1008, 1010 (5th Cir. 1997); *Carrier v. Sullican*, 944 F.2d 243, 247 (5th Cir. 1991).

Based on Plaintiff's own admissions, the headaches were mild and the other reported symptoms were either no longer associated with Plaintiff or were less severe. This is the information that the ALJ used when making its decision. "The ALJ was thus correct in concluding that the subjective complaints that Plaintiff testified to at the administrative hearing were not supported by the objective evidence of record as required." *Villa*, 895 F.2d at 1024. Several statements by Plaintiff called into question her credibility, including that she stopped working because of a reduction-in-workforce, and some suspicious behavior at the administrative hearing.[70] Based on the record, it

---

[70] Rec. Doc. No. 15, pp. 26.

is proper that the ALJ found that Plaintiff's "subjective complaints were not credible to the extent alleged." *Id.*

For the reasons enumerated above, the Court **GRANTS** the Commissioner's motion for summary judgment and **DENIES** Nelson's motion for summary judgment. Substantial record evidence and pertinent law support the administrative decisions at issue.


New Orleans, Louisiana, this 10th day of March, 2015.



UNITED STATES DISTRICT JUDGE